ELECTRO-BLEACHING GAS CO. et al. v. PARADON ENGINEERING CO.

(District Court, E. D. New York. November 10, 1925.)

1. Patents ⬤⟾328—No. 1,142,361, claims 4, 5, 6, 8, and 10, for process for antisepticizing water with chlorin, valid and infringed.

Ornstein patent, 1,142,361, June 8, 1915, claims 4, 5, 6, 8, and 10, for process for antisepticizing water by introduction of chlorin by separate minor flow, held valid and infringed.

2. Patents ⬤⟾129—Defendant in infringement suit may not properly raise issue that patent was obtained by fraud and deceit.

Defendant in infringement suit may not properly raise issue that patent was obtained by fraud and deceit.

3. Patents ⬤⟾112(3)—Patent raises presumption of novelty and utility, which defendant has burden of rebutting.

Patent is prima facie evidence of both novelty and utility, which defendant has burden of rebutting, and in favor of which every reasonable doubt should be resolved.

4. Patents ⬤⟾178—A patent is entitled to the benefit of a doctrine of equivalents commensurate with the advance made by the inventor.

A patent is entitled to the benefit of a doctrine of equivalents commensurate with advance made by inventor.

In Equity. Patent infringement suit by the Electro-Bleaching Gas Company and another against the Paradon Engineering Company. Decree for plaintiff.

Cooper, Kerr & Dunham, of New York City (Loren N. Wood and Drury W. Cooper, both of New York City, of counsel), for plaintiff Wallace & Tiernan Co., Inc.

Wood, Molloy & France, of New York City, for plaintiff Electro-Bleaching Gas Co.

Robert S. Allyn, of New York City (Goodman Block and William Katz, both of New York City, of counsel), for defendant.

CAMPBELL, District Judge. This is a suit in equity, brought by Electro-Bleaching Gas Company, the owner by assignment of patent No. 1,142,361, issued by the United States Patent Office to Georg Ornstein, assignor to Electro-Bleaching Gas Company, for process of antisepticizing water, dated June 8, 1915, and Wallace & Tiernan Company, Inc., the holders of an exclusive license, as plaintiffs, against Paradon Engineering Company, Inc., as defendant. The defendant is alleged to be a contributory infringer, in that it has manufactured and installed apparatus designed to use, and which do make use of, the patented process.

The plaintiffs seek to restrain the alleged infringement by the defendant, and to recover damages. The defendant has interposed the twofold answer of invalidity of the patent and noninfringement.

[1] This action is based on claims 4, 5, 6, 8, and 10 of the patent in suit, which read as follows:

"4. In the sterilization of flowing water, the process which comprises establishing a separate minor flow of water, causing such minor flow to spread out in one portion of its path to present an extended surface, contacting chlorin gas with such flow in such portion of its path, and thereafter uniting such minor flow of water with the main body of flowing water to be sterilized, and controlling the quantity of chlorin supplied to the main body of flowing water by controlling the rate of supply of chlorin gas to the minor flow of water.

"5. In the sterilization of flowing water, the process which comprises establishing a separate minor flow of water, causing such minor flow to spread out in one portion of its path to present an extended surface, contacting a measured flow of chlorin gas with such flow of water in such portion of its path, and thereafter uniting such minor flow of water with the main body of flowing water to be sterilized.

"6. In the sterilization of flowing water, the process which comprises establishing a separate minor flow of water, causing such flow to spread out in one portion of its path to present an extended surface, contacting chlorin gas with such flow in such portion of its path, and thereafter uniting the solution thus produced with the main body of flowing water to be sterilized."

"8. In the sterilization of flowing water, the process which comprises establishing a minor flow of water, causing such minor flow to spread out in one portion of its path to present an extended surface, expanding liquefied chlorin to the gaseous state, contacting such chlorin gas with such minor flow in said portion of its path, and thereafter uniting such minor flow of water with the main body of flowing water to be sterilized."

"10. In the sterilization of flowing water, the process which comprises establishing a separate minor flow of water, introducing a controlled amount of chlorin gas into such minor flow of water to produce a relatively strong solution of chlorin, and thereafter uniting and mixing such minor flow of water with the main body of flowing water to be sterilized, the rapidity of admixture being such as to insure dissolved chlorin reaching all portions of the main body of flowing water prior to substantial completion of the chemical changes in such dissolved chlorin incident to the dilution by such flowing water."

The application for the patent in suit was filed on February 4, 1913, and the invention was therein described by the applicant as follows:

"This invention relates to processes of antisepticizing waters, and it comprises a method wherein chlorin in determined amounts is uniformly distributed through and absorbed by a minor body of water flowing as a continuous current and said minor body is then uniformly distributed through a major body of water also flowing as a continuous current, all said operations being conducted without pause sufficient to allow disappearance of any substantial amount of said chlorin as free chlorin prior to exercising its antiseptic action; all as more fully hereinafter set forth and as claimed."

The specifications then describe at length the advantages and action of chlorin and the minute quantities required for the purposes described in the patent, the preference of the applicant for "compressed commercial gas" over other forms, with his reasons therefor, and the difficulties which are encountered in the "direct introduction of chlorin into the body of water to be treated."

The applicant then describes the process which in this case has been generally described as the "minor flow" or "solution process," and follows this with a description of several apparatus susceptible of use in his process, shown as Figs. 1, 2, 3, and 4 on the drawing accompanying them and forming part of the application and the claims.

The patent in suit was involved in the action brought by the Electro-Bleaching Gas Company against William Miller, in the District Court of the Western District of Missouri, Western Division, which was tried before Judge Van Valkenburgh, in February, 1920, who in an opinion reported in 264 F. 429, held the patent to be valid and infringed. Upon appeal to the Circuit Court of Appeals of the Eighth Circuit it was found, without passing on the validity of the patent, that the defendant Miller had not been guilty of contributory infringement; the opinion of the court being reported in 276 F. 379.

In the case before Judge Van Valkenburgh the defendant set up as anticipation the following United States patents: Hyatt, No. 369,288; Blessing, No. 412,911; Weis & Anderson, No. 694,081; Gregory, Jackson & Connet, No. 868,776; and Darnall, Nos. 1,007,542 and 1,007,647. In the action at bar the defendant set up in its answer the following patents and publications as anticipations:

United States patent No. 362,657, to James J. Powers, for apparatus for disinfecting sewage, dated May 10, 1887. The object of the invention is stated by the patentee to be as follows: "The object of my invention is to prevent noxious vapors and odors from rising and contaminating the air at the mouths of sewers; and my invention consists in discharging into the sewage as it issues from the sewer a disinfectant or precipitant, or both, in the form of gas."

The gas intended to be discharged into the sewage is chlorin, but the patent does not provide for a control of the amount of gas to be discharged. In the case of a water supply control, the amount of chlorin gas introduced is of the utmost importance, because of the effect of the introduction of too large an amount upon the taste and smell of the water.

The term "disinfecting," as used at that time, applied more to deodorizing and rendering innoxious the sewage sludge than to disinfecting it, as we now understand that term. The lack of control prevented bacteriological efficiency.

No element of the patent in suit, other than possibly the sterilization of flowing water, is referred to in the Powers patent.

United States patent No. 369,288, to John W. Hyatt, for process of purifying water, dated August 30, 1887. This patent discloses a method of precipitating impurities out of water, the invention being described in said patent as follows:

"The invention consists, first, in impregnating the water by injection into the moving current with either one of the elements of carbonate of lime (namely, carbonic acid or lime), diffusing such element in the water and then adding the other element to form a precipitate. It consists, secondly, in a special method of preparing the carbonic acid by the combustion of carbonaceous fuel and the diffusion of the carbonic acid gas in water, which is afterward injected into the moving current of impure water. It also consists in a method of forming bicarbonate of lime for the first impregnation of the water to diminish the amount of lime required in the last stage of the process."

This patent does not indicate any element of the patent in suit except the minor flow and the spreading of it. No efficient means are indicated or disclosed of controlling the gas to be introduced into the minor flow with reference to the necessities of the major flow, and chiefly for that reason the suggestion or knowledge that the minor flow might be used did not aid those who were endeavoring to solve the problem of the most efficient means of introducing chlorin gas into a water supply.

United States patent No. 412,911, to James H. Blessing, for coagulant feeder, dated October 15, 1889. This invention relates to improvements in devices for supplying liquid coagulants to water before the latter enters a filtering apparatus, and in which a portion of the water supply is diverted and passed through the tank for dissolving the coagulant, and by the aid of a pump is forced back into the main line.

The only element of the patent in suit indicated in this patent is the separate flow for a nonanalogous purpose. This flow would not be practical for chlorin treatment, because it indicates no regulation, and also because it would expose the chlorin to the air.

British patent No. 23,064, A. D. 1895, to James Hargreaves, for improvements in the treatment of sewage, and in the obtention of valuable products, accepted October 17, 1896. The invention first relates to obtaining soda, potash, and like marketable products, by electrolitically decomposing chlorides, and utilizing such chlorin in the chlorination and disinfection of sewage or other putrid matter, then to the introduction of the chlorin gas directly into the sewage, where it spreads itself in contact with the sewage and water and is quickly absorbed.

The patentee also suggests that, if it be desired to confine the chlorin to any part of the sewage, it may be done by erecting curtains, which may be made fixtures or adjustable. He also suggests that, instead of allowing the free chlorin to flow into the sewer itself, the sewage may be passed through suitable absorbing chambers, and there exposed to the action of the chlorin; agitators being employed, if necessary, to assist or expedite the process of absorption.

As another alternative he suggests that water or a portion of the sewage may be caused to absorb an excess of chlorin, and then be added to the bulk of the sewage, and that lime or other suitable alkali may be added in some instances to the chlorinated sewage. No control is provided, and I see no teaching of the use of a continuous minor flow, because for all that appears the water or portion of the sewage may be caused to absorb the excess of chlorin in a tank or other receptacle, and be dumped into the bulk of the sewage.

It seems to me that it was the batch method which was suggested by the patentee, and clearly there is no teaching of a continuous minor flow, because the patentee suggests that the method be employed in connection with an electric lighting plant, which shall during the day produce, in addition to potash, soda, and the like, chlorin for application to sewage direct, or highly chlorinated liquor for subsequent admixture with the sewage during the night, or at such other times as the plant is being employed as an electric lighting plant. No apparatus is described or shown, and this patent did not aid in the solution of the problem. This patent in its language describes what the patentee suggests may be possibilities rather than what he has found can be done, and is not an anticipation of the patent in suit. Westinghouse Co. v. Great Northern Co., 88 F. 258, at page 263, 31 C. C. A. 525.

United States patent No. 653,740, to William M. Jewell, for method of purifying water, dated July 17, 1900. The invention consists of the method of introducing into the water to be purified, or into a separate body of water which is subsequently added to the water to be purified, carbonic acid gas and iron (or its equivalents), which react to form carbonate of iron, which is then precipitated

as hydrate, thereby agglomerating or carrying down the impurities in the water.

In the preferred apparatus described by the patentee, the mixing chamber is preferably rotatable, and the solution passes into the water supply. If found necessary, it is also suggested that lime, or milk of lime, be added to produce coagulation to clarify the water.

United States patent No. 653,741, to William M. Jewell, for method of purifying water, dated July 17, 1900. The method disclosed is the production of ferrous bisulphate, a precipitating agent, its introduction into water or other liquid to be purified, the alkalinity of the water reacting with it, forming hydrate of iron, which is a coagulant and precipitates any floating material in the water.

United States patent No. 653,745, to William M. Jewell, for method of making reagents for purifying water, dated July 17, 1900. This patent differs from patent No. 653,741 only in that the ferrous bisulphate in solution is aerated, so that the oxygen of the air transforms the ferrous bisulphate to ferric sulphate.

None of these Jewell patents were mentioned in defendant's bill of particulars, nor do they include any of the elements of the patent in suit, with the exception of the establishment of a minor flow and the spreading out of the minor flow to present an extended surface. They all relate to the treatment of water by means of a coagulant. I cannot find any anticipation of the patent in suit in these patents, nor do I think they were of any practical value in the solution of the problem which was solved by Ornstein.

Mr. Jewell was also called as a witness, but his description of his own experiments is unsupported by documentary evidence or the testimony of other observers, except that Mr. Fuller, who was observing the work at Louisville, said that nothing practical came of the experiment. Clearly this is not sufficient to constitute an anticipation. The same may be said of Mr. Jewell's reference to the Bull process, operated at Bubbley creek, as he was too indefinite as to time, circumstances, duration, and outcome.

United States patent No. 694,081, to Joseph B. Weis and Louis C. Anderson, for apparatus for saturating liquids with gases, dated February 25, 1902. Judge Van Valkenburgh, in the suit against Miller, 264 Fed. at page 433, in discussing this patent with the patent in suit, said, referring to the Weis and Anderson patent:

"The former of these has as its primary object 'to provide an apparatus for economically carrying out the process of producing an aqueous solution of chlorin,' devised 'more especially for use in the manufacture of paper for bleaching the stock.' This patent has an object and purpose entirely unrelated to the purification of water, which may be said to occupy a field distinct and complete in itself. The process disclosed by Weis and Anderson is entirely remote from and unadapted to the purposes of the patent in suit. It discloses a method of producing an aqueous solution of chlorin and storing it in a reservoir from which it may be drawn off for use as needed. The apparatus embraces no pressure reducing or regulating device by which the proportion of chlorin to any other body is predetermined. Of course, the feature of distribution, through a minor body of liquid flowing as a continuous current into a major body, is conspicuously absent because in no wise related to the object of the inventor. The Weis and Anderson patent does not remotely suggest the process of the patent in suit."

This finding is fully sustained by the evidence in the instant suit, and to me it seems clear that the teaching of the Weis and Anderson patent did not aid in the solution of the problem. All that is required is to compare that patent with the patent in suit in order to observe the complete distinction.

United States patent No. 868,776, to John H. Gregory, Walter W. Jackson, and Frederick N. Connet, for automatic flow regulator for liquids and gases, dated October 22, 1907. This patent is for an apparatus to automatically control the flow of any gases or liquids into a basin by the flow of other gases or liquids, this being accomplished by utilizing the differential pressure through a "Venturi" throat, to operate the mechanism for opening and closing of valve. The patent contains a minor flow, and is used rarely and at great expense to control a minor flow with relation to a major flow; but the teaching of the patent did not solve the problem, because there is no teaching in it of applying chlorin gas to a minor flow at a rate measured and controlled by the requirements of the major flow.

United States patent No. 1,007,647, to Carl R. Darnall, for process of purifying water and sewage, dated October 31, 1911. This is a process patent for the application of dry chlorin to water for the purpose of sterilization. The subject-matter dealt with in this patent and the patent in suit is the same, but the methods proposed are radically different. In this patent the introduction of

the chlorin is by the direct method, while in the patent in suit it is by the indirect method, through the minor flow. This patent is not an anticipation of the patent in suit, because the patentee expressly disclaims the method of the patent in suit, and implies that it is impossible to chlorinate in that way, in the following language:

"Chlorinated lime and chlorinated soda have recently come into use for disinfecting sewage, and at various times it has been attempted to use chlorin gas for similar purposes but not in a dry state. The chlorinated lime or soda, or the chlorin gas, has usually been mixed with a certain quantity of water and determined amounts of this chlorinated water have been introduced into the effluvia to be disinfected. This is not an efficient method of using chlorin. * * *" And again: "When, therefore, chlorinated lime, chlorinated soda, or chlorin gas is admixed with a quantity of water and this water is afterward used to disinfect or purify large quantities of other water a great loss of efficiency is the result."

The language above quoted, used by the patentee, does not describe any method of the former use of chlorin to which he refers, and it might well be understood that there was a considerable lapse of time between the admixture of the chlorin gas and water and its subsequent use to disinfect the large quantity of water, which is the exact reverse of the method disclosed in the patent in suit. But, be that as it may, no anticipation can be based on such a reference without any description of the method, especially when coupled with the declaration that such method is inefficient.

That no one had, up to that time, succeeded in solving the problem of utilizing chlorin, notwithstanding the demand for such solution, clearly appears from the Darnall patent, and while in his case there was partial success, the patentee of the patent in suit succeeded where others failed, and his successful solution included that which Darnall had disclaimed as inefficient. This to me is very pursuasive evidence of the patentability of the invention of the patent in suit, especially in view of the general adoption of the method therein disclosed. Eibel Co. v. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523. Darnall's proposal has limited utility when and as supplemented by Tiernan's later invention of the diffuser.

Article by C. R. Darnall, M. D., on "The Purification of Water by Anhydrous Chlorin," published in Journal of the American Public Health Association, 1911. In this article Darnall, the patentee, described the foregoing patent. He estimates that a mixing chamber 16 inches in diameter and 24 feet long has a capacity of 750,000 gallons per day, while one 32 inches in diameter and 50 feet long has a capacity of 3,000,000 gallons, and that, in order to purify 750,000,000 gallons per day (the quantity furnished Greater New York), 16 mixing chambers 10 feet in diameter and 200 feet long would be required, and these would occupy about one acre of ground.

The Darnall proposal was the closest thing in the prior art to the patent in suit, but the practical difference between them is marked. Darnall required a large area for his mixing chambers. The apparatus of the patent in suit, exclusive of the gas tanks, can be carried by a workman from place to place.

Darnall interrupts the flow of water to be treated, requiring the creation of large relatively stationary bodies of water, while the application of the method of the patent in suit does not interfere in any way with the normal flow of the water, except that a small quantity of the flowing water is taken off from the aqueduct in a little pipe, the chlorin introduced, and the water and chlorin which are then in a solution are returned to the flowing water in the main.

United States patent No. 1,012,808, to William B. Bull, assignor to Chloride Process Company of Chicago, Ill., for method of purifying water, dated December 26, 1911. This patent involves the subject of the sterilization of flowing water and the establishment of a separate minor flow, which is spread out in one portion of its path. It does not, however, disclose any of the other following elements of the patent in suit, to wit: Expanding liquefied chlorin to the gaseous state; controlling the quantity of chlorin supplied to the main body of the flowing water by controlling the rate of supply of chlorin to the minor flow; contacting the measured flow of chlorin with the minor flow in the spread-out portion of its path; making the minor flow of water a relatively strong solution of chlorin, or quickly uniting and mixing the minor flow with the major flow.

The patentee proposes to impregnate the water with chlorin gas, and to pass the chlorin containing solution thus found through a mass of comminuted iron, thereby producing a solution of an iron compound, to introduce the iron salt solution into the water to be purified and to sterilize the water by precipitation. It suggests that, by employing an excess of chlorin in the solvent solu-

tion, a greater or less proportion of free chlorin may be introduced, and thereby obtain the advantages of the germicidal effect of the chlorin.

This is a hit or miss method, as there is no way of measuring the amount of chlorin in proportion to the quantity of water to be sterilized, nor of keeping the chlorin coming from the cell at a constant rate of flow. The only relationship or bearing it has on the process of the patent in suit is that a certain amount of sterilization was brought about by the use of this excess chlorin. Ferric chlorin, which it was the object of this patent to make, is not a practical sterilizing agent.

Article by Professor Earle Bernard Phelps, on "The Disinfection of Sewage and Sewage Filter Effluents," published by the government in 1909. It discusses generally the subject of the disinfection of sewage and sewage filter effluents, and suggests various possibilities as disinfecting agents, among which are the following compounds of chlorin: Chlorin gas, hypochlorite or oxychloride compounds, and electrolytic chlorin processes. He tells of an electrolytic chlorin cell having been placed at his disposal, which proved of great assistance in his experiments; but, if the professor had devised a practical method of application, he could have treated with the production of that cell 5,000,000 to 10,000,000 gallons of water per day.

While mention is made in this article of gaseous chlorin, no mention is made of chlorin solution nor of its application. The professor was experimenting on a small scale, and, as he testified, his view at that time was that chlorin gas "would not work out as well as chloride of lime, because it was necessary to have some carrier for the chlorine, and that the reaction of the chlorin itself, as compared with the chloride of lime, would be too rapid, and would be used up before the chlorin had a chance to destroy the bacteria."

That such was his view appears in the article at page 62, line 16, page 69, line 38, and page 71, line 27, and also in the statement which Tiernan testified Professor Phelps made to him in 1912. This article held out little promise that any success could be attained along the lines which the patentee in the patent in suit subsequently followed to a successful conclusion.

No anticipation can be based upon the language used by Professor Phelps in this article, because, although he may have made reference to the use of free chlorin, there was no disclosure of method or apparatus, and the conclusion he reached was the opposite of that for which the patentee of the patent in suit contended. Professor Phelps makes no claim, and apparently does not believe, that his work anticipated the invention of Ornstein in the patent in suit.

Called by the defendant, Professor Phelps described on the stand the method employed in introducing the chlorin gas into the sewage. This did not, as contended by the defendant, constitute an anticipation. No apparatus was disclosed.

The proof was insufficient as the unsupported testimony of one witness, 17 years after the experiment was performed, is wholly insufficient to defeat a patent. Searchlight Horn Co. v. Victor Talking Mach. Co. (D. C.) 261 F. 395. Nothing practical was done by the professor to overcome two of the things which held back the use of chlorin gas, to wit, the danger of handling and difficulty of accurately measuring the gas. Apparently, from the description given by the professor, the method used was not that of Ornstein, but the so-called solution was created by the bubbling of the gas through the water of the first five-gallon carboy, and the method was wasteful and impracticable.

In any event, none of the following elements of the patent in suit are contained in the method described by Professor Phelps: Spreading out of the minor flow in one portion of its path to present an extended surface; expanding liquefied chlorin to the gaseous state; controlling the amount of chlorin introduced into the major flow by controlling the amount of chlorin gas introduced into the minor flow; and contacting the measured flow of chlorin gas with the minor flow of water in the spread-out portion of its path.

Regardless of the fact that Professor Phelps' conclusions with reference to chlorin gas were the opposite of the patentee of the patent in suit, his work and publication did not constitute an anticipation, because his work was entirely experimental, nothing practical resulted from it, and it was abandoned. American Metal Cap Co. v. Anchor Cap & Closure Corp. (D. C.) 278 F. 670.

Article by Professor Whipple, on "Experiments at Ostend and Middelkerke." This article describes a method which could be used only during the day, when sunlight was present; a storage reservoir being used to hold the water for night consumption. The water was disinfected with the chlorin compound, which was generated from contacting of certain chemicals which contain chlorin, at which time coagulation was accomplished, and the coagulating and disinfecting chemicals were added to the water before it went through the filters; the fumes (peroxide of

chlorin) being drawn out and conveyed by a pipe to a water tank when they are dissolved.

There is nothing to show what operates the aspirator used to suck out the fumes and prevent them from escaping into the room, nor whether the fumes are dissolved in it; but it does show, as I have said, that they are dissolved in a tank of water. In any event, the author said in this article: "The process is not one to be commended."

No elements of the patent in suit are referred to in this article, except that both involve the sterilization of flowing water. A chemical tank is referred to, where the chemicals were made and drawn off by the batch method.

Ellms' "Description of Uses of Chlorin." This was a description of a use by the direct method, which was accomplished by the violent agitation of cascading the water over a weir. It bears no relation to the method of the patent in suit. His familiarity with a method of producing and supplying a solution of lime, at Louisville, and applying it directly, did not add anything to his knowledge of the art.

Powell's "Description of Experience with Solution Methods." He followed the usual batch method in the application of chloride of lime, and his use of the additional water supply was merely to flush out his pipe lines and prevent the formation of a deposit. His work cannot be an anticipation, because in his description of his experience there was no reference to the important elements of the patent in suit, nor was there any supporting evidence, such as would be required to establish his work as an anticipation.

Defendant also offered in evidence the file wrapper and contents of the patent in suit, and contends that the Examiner was misled when he held: "Upon a careful reconsideration of the remarks accompanying the above-cited amendment, the Examiner has arrived at the conclusion that the process claimed discloses such an increased degree of utility over the methods set forth in the references as to justify the allowance of the claims in this application."

[2] If defendant seeks to set aside the patent as having been obtained by fraud or deceit, this is not the proper action in which to tender that issue; but, if defendant contends that the process claimed does not disclose a markedly increased degree of utility over the methods of the prior art, then I must disagree with it. The only processes which could compare with that of the patent in suit, as to cost, were the direct method and the one involving the use of chloride of lime. There are practically no installations using the chloride of lime process to-day. The advantages of liquid chlorin over hypochlorite of lime are shown by Dr. Frank E. Hale, in his article on the "Relative Efficiency of Liquid Chlorin and Hypochlorite of Lime," introduced by the defendant.

The advantages of the solution method over the direct method are many, namely: Less difficulty in operation or danger of getting out of order; utilization of all the chlorin injected into the water; possibility of using in shallow waters pipes or pipe systems, where the direct system would be inefficient, because of the coming off of the chlorin gas, and because of corrosion and other troubles. There are no cases where the chlorin would work more efficiently when introduced by the direct method, but where you have a sufficient depth of water into which the diffusions may be placed, and the climate is not too cold, the direct method could be used as efficiently.

That the method of the patent in suit is more efficient than any other is to my mind conclusively shown by the actions of substantially all of the technical and practical witnesses produced by both parties, because, while some of the defendant's witnesses pay high tribute to the prior art, all of the said witnesses of both parties, both by practice and by advice, seem to have accorded to the method of the patent in suit their approval, by the use of the same almost to the exclusion of all other methods. The method of the patent in suit appears to have substantially supplanted all other methods; the direct method only being used in a limited number of cases where, due to the peculiar conditions, it can be used efficiently.

Many appear to have been interested in the problem which confronted Ornstein, and, even if it was shown that each step pursued by him had been known to the art, yet he would be entitled to the reward of discovering how to combine all of them to produce the method which has proved so efficient that it has virtually supplanted all others for general use.

Defendant contends that, in view of the prior art, Ornstein's method was obvious, and therefore there was no invention in the patent in suit; but it seems clear to me, from all of the evidence, both oral and documentary, offered on behalf of both parties, that such contention cannot be sustained. With all of the teachings of the prior art before them, and with full knowledge of the germicidal effects of chlorin gas, the men skilled in the art, actually and earnestly engaged in trying to discover the most efficient and practical method of purifying water,

proposed or used a great variety of other agents than chlorin gas, until after Ornstein had discovered the method disclosed in the patent in suit, since which time they have adopted and utilized it.

To the men learned in the art it therefore was not obvious, because even Darnall, who came nearest to the solution of the problem, disclaimed the method of the patent in suit, and implied that chlorin could not be used in the way afterward disclosed by Ornstein in the patent in suit. What may seem obvious now is not the test, because that is wisdom born after the event. United States v. Bell Telephone Co., 167 U. S. 224, 261, 17 S. Ct. 809, 42 L. Ed. 144. International Tooth Crown Co. v. Richmond (C. C.) 30 F. 778.

[3] The patent is prima facie evidence of both novelty and utility, and neither of those presumptions has been rebutted (Lehnbeuter v. Holthaus, 105 U. S. 94, 26 L. Ed. 939), and not only was the burden of proof on the defendant to overcome the presumption, but every reasonable doubt should be resolved against it (Coffin v. Ogden, 18 Wall. [85 U. S.] 120, 125, 21 L. Ed. 821; Washburn v. Gould, 3 Story, 122, 124, Fed. Cas. No. 17214; Cantrell v. Wallick, 117 U. S. 689, 6 S. Ct. 970, 29 L. Ed. 1017; Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 488, 23 L. Ed. 952).

The importance of this patent need not be enlarged upon, because its general use and the great benefits which have come to the people of the country by the use of chlorin gas in the treatment of water after Ornstein's invention, with the reduction of the number of cases of typhoid fever, speaks for itself. The patent is entitled to a liberal construction. Eibel Co. v. Paper Co., supra.

In my opinion, the patent in suit was not anticipated by any prior patent or publication. I therefore find that the patent in suit is valid.

The plaintiffs, in 1917, discontinued the use of the scrubbing or absorbing tower, and used in its place an injector. The defendant, likewise, does not use a scrubbing or absorbing tower, but uses an injector, which in its essential features is the same as the injector used by the plaintiff Wallace & Tiernan Co., Inc.

Defendant contends that the absorption tower shown in the patent in suit is an essential element, and that the claims of the patent in suit should be limited in their construction, so that the filming or spreading out should be accomplished by the use of the tower and not an injector. This cannot be

8 F.(2d)—57

true, if the injector is the equivalent of the tower, in so far as the method disclosed by the patent is concerned.

We are, therefore, brought to a consideration of the law of equivalents, because, unless the application of chlorin by the injector used by the defendant is the equivalent of the application of the chlorin by the absorption tower, shown in the patent in suit, the plaintiffs cannot sustain their claim of infringement. "Reason seems to indicate that one act is the equivalent of another when it works in substantially the same way to accomplish the same result." Walker on Patents (5th Ed.) 421.

[4] A patent is entitled to the benefit of the doctrine of equivalents, commensurate with the advance made by the inventor (Paper Bag Patent Case, 210 U. S. 415, 28 S. Ct. 748, 52 L. Ed. 1122), and the degree of advance of the patent in suit was large. The essential result aimed at is the substantially complete absorption of the chlorin gas by the minor flow, and this is obtained, as pointed out in the patent in suit, "by causing such minor flow to spread out in one portion of its path to present an extended surface, contacting chlorin gas with such flow in such portion of its path."

The evidence shows that there is no difference in the method of "filming out" and presenting "an extended surface" of the minor flow in the injector of the defendant's structure and the absorbing tower shown in the patent in suit, and that the injector in the defendant's structure is the equivalent and performs the same function of "filming out" the minor flow as the scrubbing or absorbing tower of the patent in suit. The "filming out" in the injector in the defendant's structure takes place at two points: (1) By narrowing and lengthening the stream in the throat; and (2) by increasing the surface of the water in contact with the gas, by breaking the gas into bubbles at the throat and carrying them into the hose.

The evidence also shows that substantially complete absorption of the chlorin gas by the minor flow takes place in the injector and hose of the defendant's structure, and this is sufficient to constitute infringement, even if the claims were limited to complete absorption by the minor flow, which they are not. Hildreth v. Mastoras, 257 U. S. 27, 36, 42 S. Ct. 20, 66 L. Ed. 112.

The weight of the evidence, that substantially all of the gas is absorbed in the injector and hose of the defendant's structure, does not seem to me to have been lessened by the testimony of the defendant's witness Ellms, for many reasons, but especially be-

cause it is perfectly compatible with the claim of absorption of substantially all the gas in the minor flow that a minute quantity might remain which could be detected by the starch iodine tests, and it must further be noted that he did not exclude the possibility that the chlorin detected was due to air bubbles from the minor flow.

In each of claims 4, 5, 6, and 8 of the patent in suit, one of the essential steps claimed is causing the minor flow "to spread out in one portion of its path to present an extended surface," and another essential step is "contacting chlorin gas with such flow in such portion of its path," and defendant contends that neither of these steps are taken in the operation of its apparatus. With this contention I cannot agree, because in my opinion that is exactly what does take place in the operation of defendant's apparatus, for the reason that the absorption tower of the patent in suit divides the minor flow into a number of tiny slow-moving streams, of large aggregate surface, to which chlorin is applied while the injector of the defendant's apparatus makes a single stream, rapidly moving, of filmlike or, extended surface, with respect to the current of gas applied to it at that portion or zone.

In claim 10 of the patent in suit, one of the essential steps claimed is "uniting and mixing such minor flow of water with the main body of flowing water to be sterilized; the rapidity of the admixture being such as to insure dissolved chlorin reaching all portions of the main body of flowing water prior to substantial completion of the chemical changes in such dissolved chlorin incident to the dilution of such flowing water," and defendant also contends that this step is not taken in the operation of its apparatus. But again I disagree with it, because from all the evidence it appears that the dissolved chlorin did reach all portions of the main body prior to the completion of the chemical changes incident to its dilution.

All the other essential features of the Ornstein patent are embodied in and used by the apparatus of the defendant. Having found that the patentee invented something which is described in the specifications and covered by the claims, and that the defendant has appropriated all the advantages of the invention, infringement cannot be avoided merely by changes in the form of the defendant's apparatus from the absorption tower to the injector.

It is impossible for me to believe, in the face of the letters and literature of the defendant, the testimony of the defendant's witness Donnelly, and the operation of the machine at Allentown, N. J., that the officers of the defendant, two of whom had formerly been in the employ of the plaintiff Wallace & Tiernan, Inc., did not know that the injector in its apparatus was designed and being sold to be used for the same purpose as the absorbing tower of the patent in suit, especially in view of the testimony of the defendant's witness Russell, that the "Paradon solution feed" was substituted for the Electro-Bleaching Gas solution machine at Norristown, Pa.; that is, it performed the same work on the same supply. It was a substitute.

The defendant makes and installs its apparatus, intending to make use of the process of the patent in suit, and is guilty of a contributory infringement of claims 4, 5, 6, 8, and 10 of the patent in suit. A decree may be entered in favor of the plaintiffs against the defendant, with the usual reference.

Settle decree on notice.